J. A06012/16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| NATURES WAY SPRINGS L.P., IND, AND | : | IN THE SUPERIOR COURT OF |
| AS A MEMBER OF LEHIGH POINTE | : | PENNSYLVANIA |
| PROPERTY OWNERS ASSOC. AN UNINC. | : | |
| ASSN., | : | |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| C. PANEL HOLDING LLC ET AL, | : | |
| | : | No. 1222 MDA 2015 |

Appeal from the Judgment Entered July 6, 2015
In the Court of Common Pleas of Luzerne County
Civil Division No(s).: 2011-09037

BEFORE: LAZARUS, J., STABILE ,J., and DUBOW, J.

MEMORANDUM BY DUBOW, J.:                    **FILED MAY 25, 2016**

Appellant Nature's Way Springs L.P., individually and as a member of Lehigh Pointe Property Owners Association, appeals from the judgment entered in its declaratory judgment action by the Luzerne County Court of Common Pleas on July 6, 2015, in favor of Appellees, C. Panel Holding, LLC, Clarence and Helen S. Peterson, Tamorah P. Murray, Diane M. Jellen, John McCaffery and Louise F. Hoekstra, James C. Petty and Wallace L. Blore, Matthew Benzinger, and Northumberland National Bank, as trustee of Micheal Apfelbaum, SEP-IRA. After careful review, we affirm.

The trial court set forth the relevant factual and procedural history of this case in its April 29, 2015 Opinion and we adopt its recitation for purposes of this Appeal. We summarize as follows.

At issue in this matter is the deterioration of a road and culvert located in Lehigh Pointe, a primarily residential area, and a "restrictive covenant" requiring, among other things, the owners of the lots in Lehigh Pointe to share in the costs of road maintenance equally. Appellant filed a declaratory judgment action seeking a ruling that Appellees were obligated to share in the cost of the repair of a roadway traversing the area. After completing discovery, Appellant moved for summary judgment. The trial court denied the motion and the matter proceeded to a bench trial on Appellant's request for declaratory relief. Following the trial, the court denied the relief Appellant sought, holding that the relevant "restrictive covenant" was actually an easement, and Appellant's commercial use of 80,000 pound vehicles to traverse the shared roadway was an unreasonable use of that easement. Significantly, the trial court made the following findings of fact:

1. Lehigh Pointe was originally intended to be a residential community, the development of which was to take place in phases.

2. Development stalled before the first phase was complete.

3. No Lehigh Pointe Property Owners Association was ever formed.

4. Pointe Drive was intended for residential traffic.

5. The Lehigh Pointe property owners' deeds created a reciprocal scheme of easements granting each property owner the rights of ingress and egress over Pointe Drive.

6. [Appellant's] property was a dominant estate with regard to the easement over the Pointe Drive culvert.

7. A significant portion of the damage to the Pointe Drive culvert was caused by the introduction and continuation of significant truck traffic to and from the commercial spring.

Trial Ct. Op. at 13.

## Issues on Appeal

Appellant raises the following three issues on appeal:

1. Are the owners of a jointly held easement, created by the filing of a plot plan after approval by a local government unit, bound by the "restrictive covenants" clearly recited in the plan calling for the property owners to "share road maintenance costs equally?"

2. Even if [ ] Appellant can be held to have exceeded the "reasonable scope" of its easement, should it be held to be solely responsible to repair the roadway, even though it had only come into possession of its property rights in 2008 whereas the roadway in question was constructed many years earlier?

3. Should summary judgment have been granted requiring the owners of the joint easement created in a filed subdivision plan to "share road maintenance costs equally" where there was no ambiguity in the "restrictive covenants" and no restrictions placed on any easement holder's use of the shared easement?

Appellant's Brief at 4.

## Legal Analysis

Our standard of review in a declaratory judgment action is as follows:

We review the decision of the trial court as we would a decree in equity and set aside factual conclusions only where they are not supported by adequate evidence. We give plenary review, however, to the trial court's legal conclusions.

> In reviewing a declaratory judgment action, we are limited to determining whether the trial court clearly abused its discretion or committed an error of law.
>
> Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.

*Jarl Investments, L.P. v. Fleck*, 937 A.2d 1113, 1121 (Pa. Super. 2007) (citations and quotation marks omitted).

Further, this Court had set forth our standard of review of a decision rendered following a non-jury trial as follows:

> [W]e recognize that findings of the lower court will not be disturbed on appeal absent a clear abuse of discretion or error of law. It is equally axiomatic, however, that this court is not bound by the trial court's conclusions of law but is free to draw its own inferences and conclusions from the facts as established.

*Minteer v. Wolfe*, 446 A.2d 316, 318 (Pa. Super. 1982) (citations omitted).

## **Issue 1**

Appellant first claims that the trial court erred in not requiring that the owners of the lots in Lehigh Pointe share on a *pro rata* basis the cost of road maintenance as required by Restrictive Covenant 6 of the Lehigh Pointe subdivision plan, recorded in Luzerne County on August 5, 1987.

Restrictive Covenant 6 states: "All roads in Lehigh Pointe are not to be dedicated for public use and will be private. All purchasers of lots will

automatically become members of Lehigh Pointe Property Owners Association and will share road maintenance costs equally." RR at 102a.

The trial court found that, although listed on the subdivision plan as a restrictive covenant, the purpose of Restrictive Covenant 6 was 1) to prevent the roads in Lehigh Pointe from being publically dedicated; 2) to make all purchasers of Lehigh Pointe lots members of the property owners association; and 3) to require all purchasers of Lehigh Pointe lots to share road maintenance costs equally. Trial Ct. Op. at 9. The court concluded that only the prohibition against publicly dedicating the roads in Lehigh Pointe was truly a restrictive covenant, and the remaining "restrictive covenants" were actually easements.[1] *Id.* As noted above, the trial court found that the property owners' deeds created "a reciprocal scheme of easements granting each property owner the rights of ingress and egress over Pointe Drive." *Id.* at 13.

The trial court then determined that the primary issue presented in this case is the scope of the easement granting the right of way over Pointe Drive. *Id.* at 14. The court interpreted the easement grant using the rules of contract construction, noting that "where the grant of an easement is unrestricted, the grantee is given such rights as are necessary for the reasonable and proper enjoyment of the thing granted." Trial Ct. Op. at 10-

---

[1] Appellant does not contest the trial court's finding that many of the "restrictive covenants" listed on the subdivision plan are easements.

11, (citing ***Zettlemoyer v. Transcontinental Gas Pipeline Corp***, 657 A.2d 920, 924 (Pa. 1995) and ***Lease v. Doll***, 403 A.2d 558 (Pa. 1979)). As our Supreme Court recognized in ***Lease***, "when the terms of an express grant are general, ambiguous, and not defined by reference to the circumstances known to the grantee at the time of the grant . . . the easement may be used in any manner that is reasonable." ***Lease***, 403 A.2d at 562.

Here, the trial court determined that "the language of Lehigh Pointe property owners' deeds does not specify the scope of the right of way." Trial Ct. Op. at 14. Accordingly, because there were no explicit restrictions in Appellant's easement over Pointe Drive, the court concluded that Appellant "may use the easement in any reasonable manner." ***Id.*** After considering the evidence and testimony, and conducting a judicial viewing of Lehigh Pointe, the trial court concluded that Appellant's use of Point Drive "exceed[ed] the reasonable scope of the easement [it] possessed over Pointe Drive." ***Id.*** at 15.

After a thorough review of the record, the briefs of the parties, the applicable law, and the comprehensive and well-reasoned opinion of the trial court, we conclude that there is no merit to Appellant's first issue on appeal. Accordingly, we affirm on the basis of the trial court's opinion as to Appellant's first issue. ***See id.*** at 14-16.

**Issue 2**

Appellant next avers that the trial court erred by holding Appellant responsible for its own conduct as well as for that of the prior owners of Appellant's commercial lot.[2]  Appellant contends that it should not be legally liable for damage caused by parties other than Appellant, and baldly claims that the trial court erred in concluding that the "'reasonable use' of the easement ran with the land."  Appellant's Brief at 34-35.  Appellant characterizes the trial court's conclusion as follows: "the court essentially held that even though [Appellant] only owned its lot since 2008, [Appellant] would be responsible for the rusting out of the culvert over the twenty plus years the culvert had been in place."  *Id.* at 34.

After considering the testimony of the parties' engineering experts, the trial court specifically determined that the stresses on Pointe Drive came from the increased weight and frequency of commercial truck traffic travelling on it.  Trial Ct. Op. at 15.  The court recognized that some natural deterioration of the culvert had occurred, but ultimately determined that "the culvert would not have failed when it did but for the trucks frequently passing over it."  *Id.*  The court thus concluded that the actions of Appellant and its predecessors in interest, in exceeding the reasonable scope of the easement they possessed over Pointe Drive, caused the need for significant

---

[2] Appellant's predecessor also operated 80,000 pound commercial vehicles over the easement.

repairs to Pointe Drive. *Id.* The court found that Appellant was the "dominant estate" and, as such, is "obligated to remedy the damage themselves." *Id.* at 16.

Appellant's characterization of the court's ruling is misleading. In seeking a declaratory judgment, Appellant sought only a determination that Appellees must contribute to the past and future costs of repairing and maintaining Pointe Drive and the culvert under it. The court denied this relief, finding that Appellants are "not obligated to contribute to the construction done on the culvert at issue in this matter." *Id.* at 16. Contrary to Appellant's averment, this ruling does not hold Appellant responsible for damage caused by its predecessors in interest. In fact, nothing in the court's ruling in this declaratory judgment action precludes Appellant from attempting to obtain remuneration from its predecessors in interest. Appellant's second issue lacks merit.

## Issue 3

Appellant claims in its third issue that the trial court erred in not granting its Motion for Summary Judgment. Appellant argues that because it submitted certified copies of the deeds of each of the Appellees and "the language of the easements and covenants in question [was] clear and unambiguous," there were no material facts at issue and the trial court have enforced the covenants as written at the summary judgment stage. Appellant's Brief at 37.

We review a grant of summary judgment under the following well-settled standards:

> Pennsylvania law provides that summary judgment may be granted only in those cases in which the record clearly shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. The moving party has the burden of proving that no genuine issues of material fact exist. In determining whether to grant summary judgment, the trial court must view the record in the light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Thus, summary judgment is proper only when the uncontraverted allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. In sum, only when the facts are so clear that reasonable minds cannot differ, may a trial court properly enter summary judgment.
>
> On appeal from a grant of summary judgment, we must examine the record in a light most favorable to the non-moving party. With regard to questions of law, an appellate court's scope of review is plenary. The Superior Court will reverse a grant of summary judgment only if the trial court has committed an error of law or abused its discretion. Judicial discretion requires action in conformity with law based on the facts and circumstances before the trial court after hearing and consideration.

***Weible v. Allied Signal, Inc.***, 963 A.2d 521, 525 (Pa. Super 2008) (citation and quotation omitted).

In response to Appellant's motion, Appellees noted that there were many disputed facts concerning the enforceability of Covenant 6 including: 1) whether the property owners had abandoned the restrictive covenant; 2)

whether Appellant overburdened its easement; 3) whether the character of the neighborhood had changed owing to Appellant's trucking operations rendering the covenant unenforceable; 4) whether Appellant knew that there was no property owners association in existence; 5) whether Appellant knew that its predecessors in interest had paid for road maintenance needed because of their trucking operations; 6) whether the road repairs asserted by Appellant were actually necessary when the road remained passable by passenger vehicles at the time of the repair; and 7) whether Appellant had obtained its property for a lower purchase price because Appellant knew it would be responsible for road maintenance. Br. in Opp'n to Pl.'s Mot. for Summ. J., 11/29/12, at 3.

Appellant's argument that there were no issues of material fact is belied by our review of the record, in particular the 287 pages of trial testimony taken over the course of two days. At the time that Appellant filed its Motion for Summary Judgment, the trial court correctly determined that myriad issues of material fact existed so that entry of summary judgment in Appellant's would have been imprudent. The parties presented those issues of fact at trial where the court heard testimony from lay persons and experts about, among other things, the character of the development and the cause of the damage to Pointe Drive.

The trial court did not abuse its discretion in determining that there were issues of material fact and that Appellant was not entitled to judgment as a matter of law.

Judgment affirmed. Case remanded. Jurisdiction relinquished.

Judge Lazarus joins this Memorandum.

Judge Stabile files a Concurring Memorandum.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/25/2016

NATURE'S WAY SPRINGS, L.P.,     : IN THE COURT OF COMMON PLEAS
                                   :     OF LUZERNE COUNTY

           Plaintiff           :

                                     :

    vs.                        :     CIVIL ACTION – LAW

                                     :

CPANEL HOLDINGS, LLC;         :
CLARENCE AND HELEN S. PETERSON; :
TAMORAH P. MURRAY;            :
DIANE M. JELLEN;               :
JOHN McCAFFERY and LOUISE F.     :
HOEKSTRA;                    :
JAMES C. PETTY and BLORE L.       :
WALLACE;                      :
MATTHEW BENZINGER;          :
LEHIGH POINTE PARTNERS; and      :
NORTHUMBERLAND NATIONAL      :
BANK, as trustee of Michael Apfelbaum   :
SEP-IRA,                      

                                     :

           Defendants      : NO.       9037 of 2011

2015 APR 29 PM 2:45

FILED
PROTHONOTARY
LUZERNE COUNTY

## OPINION

This Opinion arises from a Complaint for Declaratory Judgment filed on July 12, 2011 by Plaintiff Nature's Way Springs, L.P. seeking a declaration that 1) the captioned Defendants are required to contribute towards past and future repairs performed on a common roadway and 2) the Defendants, along with Plaintiff, must form and incorporate the Lehigh Pointe Property Owners Association as contemplated by a subdivision plan filed in 1987.

For the reasons that follow, this court finds in favor of the Defendants.



EXHIBIT

A

## FACTUAL BACKGROUND

### The Plan

This case involves a 209.29-acre tract of land in Foster Township, Pennsylvania, originally purchased by Boulder Run Corporation in 1985. In 1987, Boulder Run Corporation submitted a subdivision plan (the "Plan") for the tract of land, calling the tract the Lehigh Pointe Development ("Lehigh Point"). The Plan contained the following relevant "General Notes":

1. Owner of record is Boulder Run Corporation, R.D. 1, Box 1518, White Haven, PA 18661.

2. Total number of lots is 10 plus the remainder of the tract.

3. Total area being subdivided is 33.43 acres.

4. Total area remaining is 175.86 acres.

5. All lots to be served with individual wells.

6. All lots to be served with on-lot sewage systems contingent upon the local sewage enforcement officer's approval and recommendation.

7. Five (5) foot contour interval based on 1929 mean sea level datum.

8. The entire tract is wooded.

9. The development of the entire tract to take place in phases.

10. A twenty (20) foot wide utility easement, centering on and running parallel with all lot, property, and right-of-way lines, shall be provided.

2

The Plan also specified six numbered restrictive covenants, the last of which ("Covenant 6") is crucial to the present litigation.[1] Covenant 6 reads as follows:

"All roads in LEHIGH POINTE are not to be dedicated for public use and will be private. All purchasers of lots will automatically become members of Lehigh Pointe Property Owners Association and will share road maintenance costs equally."

The Plan was approved by the Board of Supervisors of Foster Township on June 9, 1987, and was recorded in Luzerne County on August 5, 1987.

### The Pointe Drive Culvert

The only means of vehicular access to Lehigh Pointe is via Pointe Drive, a private dirt road. Accessible on the west from State Route 940, Pointe Drive runs east for about a third of a mile, at which point it splits, with River Drive proceeding east to the ten numbered lots and Pointe Drive continuing south to the remainder of the tract. Both River Drive and Pointe Drive terminate in dead-ends.

Approximately a quarter-mile east of State Route 940, shortly before River Drive splits off, Pointe Drive passes over a culvert, the eventual deterioration of which is the inciting factor in this litigation. The culvert, which was constructed at some point before 1987, was originally 10 feet in diameter and made of a corrugated metal material. The

---

[1] The other Restrictive Covenants are:
1. Wells & Sewage Disposal Systems shall be constructed in accordance with standards set forth by The Department of Environmental Resources.
2. No Mobile Homes will be permitted on any lot.
3. All lots shall be kept neat and orderly.
4. Only licensed pleasure vehicles may be parked or stored on any lot if not garage kept.
5. Any driveway entrance shall make adequate provision for parallel drainage facilities.

3

culvert, the top of which was located approximately 18 feet below the surface of Pointe Drive, allowed a small creek to pass beneath the road. In order to reach any of the structures that have been built in Lehigh Pointe, one must drive over the culvert.

### Conveyance of Deeds

It is agreed that each of the parties in this case can trace the ownership of their respective parcels back to the Boulder Run Corporation. The chains of title for the following parties are relevant:

### Plaintiff Natures Way Springs, L.P.

Plaintiff attained title to its 75 acre lot by conveyance from Group Mountain Springs via deed dated August 29, 2008. Group Mountain Springs had owned the lot from July 10, 2002 to August 29, 2008. Prior to this, the lot was owned by Tulpehocken Spring Water Company, Inc. ("Tulpehocken") (October 12, 1999 to July 10, 2002) and Boulder Run Corporation (October 8, 1985 to October 12, 1999). Language in each deed in this chain of title subjects the property to the "benefits, privileges, easements, exceptions, reservations, restrictions, covenants, terms and conditions contained in prior deeds in the chain of title."

### Defendant Lehigh Pointe Partners

Defendant Lehigh Point Partners attained title to its 101 acre lot by conveyance from Darlene and Gregory S. Ladner via deed dated November 17, 1999. The Ladners had owned the lot from October 14, 1998 to November 17, 1999. Prior to this, the lot

was owned by Russel Minerals (Pennsylvania), Inc. (September 21, 1989 to October 14, 1998), First Penn Land Company, Inc. (September 15, 1988 to September 21, 1989) and Boulder Run Corporation (October 8, 1985 to September 15, 1988).

### Other Defendants

The other Defendants in this case are owners of the 10 numbered lots designated in the Plan. Each of these Defendants' deeds specifies which numbered lot described, referencing the Plan directly.

### Language of the Deeds

Each deed contains roughly the same language regarding the use of the roads in Lehigh Pointe, including Pointe Drive:

> SUBJECT to and including a right-of-way unto Boulder Run Corporation
> and any grantees of Boulder Run Corporation presently of record, its
> successors and assigns, over the fifty (50) foot right-of-ways as shown on
> the plot plan of Lehigh Pointe, Sections II and III, designated as Laurel
> Drive, Butte Drive and Pointe Drive.

### Use of the Properties/Development of the Tract

Following the approval of the Plan in 1987, development of Lehigh Pointe proceeded inconsistently. Houses were constructed on some, but not all, of the ten numbered lots, and the remaining 175.86 acres remained unoccupied until 1999, when Tulpehocken purchased the 75 acre lot. Shortly thereafter, Tulpehocken developed a

5

commercial spring on the lot, and began removing water from underground. The spring operation continues to this day.

As part of the spring operation, tanker trucks began driving the length of Pointe Drive to reach the spring and remove water from the site. Testimony at trial showed that Tulpehocken and each of its successors in interest, including Plaintiff, performed some work on the surface of the roadway at their own expense to keep it passable by trucks, but the frequency and extent of this work was not established.

From the approval of the Plan until 2011, no Lehigh Pointe property owner made any attempt to convene, organize, or otherwise utilize the Lehigh Pointe Property Owners Association as was contemplated in Covenant 6.

### Failure of the Culvert

In April 2011, while performing maintenance work on the road surface, Plaintiff noticed deterioration of the culvert and the road passing over it. A hole approximately 3 feet in diameter had formed on the roadway, and quickly widened to 20 feet in diameter following storms. In order to reduce the load on the culvert and prevent further deterioration, Plaintiff removed all but approximately three of the twenty feet of cover above the culvert.

Shortly after the hole was discovered, Plaintiff undertook emergency temporary repairs.[2] On June 7, 2011, after the temporary repairs were complete, Plaintiff sent each owner of Lehigh Pointe property a letter stating that:

---

[2] Plaintiff characterizes these repairs as being necessary to keep the road passable to vehicular traffic; Defendants state that cars could still pass over the culvert and that the repairs were only necessary to keep the road passable by trucks.

- Due to the deterioration of the culvert, Plaintiff had undertaken emergency repairs, the cost of which amounted to $45,480.10;

- Although no Property Owners Association had been officially formed or convened, each property owner was a member of the Association pursuant to Covenant 6, and thus each property owner was required to cover a portion of the cost of these repairs; and

- Due to the nature of the damage to the culvert, further permanent repair to the road would be necessary in the near future.

The letter requested that each property owner pay a pro rata share of the $45,480.10 corresponding to the portion (by acreage) of Lehigh Pointe belonging to that property owner.[3]

A subsequent inspection of the culvert by Jim Hendricks, P.E., who later served as a trial expert for Plaintiff, revealed significant deterioration. The top of the culvert was bent and buckled at places, such that the diameter of certain areas of the culvert was reduced from 9 feet to less than 7 feet. The bottom of the culvert had rusted in multiple spots, and in places the sides of the culvert had rotated downward and curved into the culvert. Hendricks concluded that the culvert was at risk of catastrophic failure at any time.

---

[3] The proposed breakdown of payments was as follows: 1. cPanel Holding LLC: 6.43 acres, 3.07% of original parcel, $1,397.82 pro rata share; 2. Clarence & Helen Peterson: 10.00, 4.78%, $2,173.90; 3. Tamorah P. Murray: 3.01, 1.44%, $654.34; 4. Diane M. Jellen: 3.97, 1.90%, $863.04; 5. John McCaffrey & Louise F. Hoekstra: 1.94, .93%, $421.74; 6. Victor Capo: 3.88, 1.85%, $843.48; 7. James C. Petty & Wallace L. Blore: 1.94, .93%, $421.74; 8. Matthew Benzinger: 2.00, .96%, $434.78; 9. Lehigh Point Partners: 100, 47.80%, $21,738.97; 10. Nature's Way Springs: 76.04, 36.35%, $16,530.31.

## PROCEDURAL HISTORY

On July 12, 2011, a little over a month after Plaintiff sent the letter to the other Lehigh Pointe property owners, Plaintiff filed a Declaratory Judgment Action seeking to have the court declare Covenant 6 valid and applicable; in particular, Plaintiff wished to require Defendants to contribute to the cost of past and future repairs to the road and to participate in the formation of the Lehigh Pointe Property Owners Association. Plaintiff also sought costs and fees associated with the litigation.

Following the resolution of preliminary objections, separate Answers to the Declaratory Judgment Action were filed by the following groups of Defendants:

- cPanel Holdings, LLC, Helen S. Peterson, John McCaffery, Louise F. Hoekstra, Matthew Benzinger, Lehigh Pointe Partners, and Northumberland National Bank as trustee of Michael Apfelbaum SEP-IRA;

- Tamorah P. Murray; and

- Diane M. Jellen.

No Answer was filed by Defendants James C. Petty and Wallace L. Blore,[4] and a default judgment was entered against these Defendants on June 13, 2012.[5]

As litigation was ongoing, Plaintiff solicited bids for permanent repairs to the road and culvert. On November 12, 2013, Plaintiff sent the other Lehigh Pointe property owners a letter informing them that construction was to begin within 60 days. On

---

[4] Wallace L. Blore was incorrectly identified as Blore L. Wallace in the caption of this case and on most of the related documents.

[5] Defendants Petty and Blore submitted to Plaintiff the amount Plaintiff identified as their pro rata share, but this payment was not received until after they had been named as Parties to the action. Defendants Petty and Blore testified that they paid their share because they believed that it was fair for them to contribute to the payments and that a property owners association should be formed.

8

January 3, 2014, Plaintiff sent another letter to the property owners, advising that the ongoing construction was estimated to cost a total of $183,928.

The matter was set for a non-jury trial, the first phase of which commenced on January 12, 2015. This first phase was held strictly to determine if Plaintiff was entitled to declaratory judgment, and any discussion of damages was to be held at a later date if necessary. Because this court finds in favor of the Defendants, no further proceedings are required.

## RELEVANT LAW

A survey of Pennsylvania case law reveals no situation extremely similar to the case at hand. This case raises fairly complex issues that implicate the law of covenants (restrictive and otherwise), easements, property owners' associations, and general equitable principles. This section will discuss these areas of the law in turn.[6]

### Covenants

Although Covenant 6 is listed on the Plan as a "Restrictive Covenant," and the Parties treat it as such, it really purports to accomplish three things, only one of which is "restrictive": 1) prevent the roads in Lehigh Pointe from being publicly dedicated; 2) make all purchasers of Lehigh Pointe lots members of the Property Owners Association; and 3) require all purchasers of Lehigh Pointe lots to share road maintenance costs equally. As such, both the laws of restrictive covenants and of other real covenants are relevant to the case at hand.

---

[6] In addition to these areas of law, Defendants raise additional legal issues such as the statute of frauds, the doctrine of laches, and the statute of limitations. Because we find that these issues do not apply to the case at hand, we decline to discuss them here.

9

The interpretation of covenants in deeds is necessarily guided by principles of contract law. *See, e.g.,* In re Mather's Estate, 189 A.2d 586, 589 (Pa. 1963); Baumgardner v. Stuckey, 735 A.2d 1272, 1274 (Pa. Super. 1999). As in other forms of contractual interpretation, when dealing with covenants "[i]t is fundamental that the intent of the parties governs and that such intent must be ascertained from the entire instrument...." Mishkin v. Temple Beth El of Lancaster, 239 A.2d 800, 803 (Pa. 1968) (citing Mather's Estate). Such intent is ascertained "by examining the language of the covenant in light of the subject matter thereof, the apparent purpose of the parties and the conditions surrounding execution of the covenant." Gey v. Beck, 568 A.2d 672, 675 (Pa. Super. 1990).

### Easements

As is the case with covenants, "[i]t is well established that the same rules of construction that apply to contracts are applicable in the construction of easement grants." Zettlemoyer v. Transcontinental Gas Pipeline Corp., 657 A.2d 920, 924 (Pa. 1995). Zettlemoyer succinctly states these rules:

> In ascertaining the scope of an easement [when not ambiguously specified], the intention of the parties must be advanced. "Such intention [of the parties] is determined by a fair interpretation and construction of the grant and may be shown by the words employed construed with reference to the attending circumstances known to the parties at the time the grant was made." Where the grant of an easement is unrestricted, the

10

grantee is given such rights as are necessary for the reasonable and proper enjoyment of the thing granted.

Id., internal citations omitted. Similar principles are described in Lease v. Doll:

In ascertaining the scope of an easement created by express grant, the intention of the parties to the grant must be advanced.... Moreover, when the terms of an express grant of an easement are general, ambiguous, and not defined by reference to the circumstances known to the grantee at the time of the grant, the express easement is to be construed in favor of the grantee, and the easement may be used in any manner that is reasonable.

Lease v. Doll, 403 A.2d 558, 562-63 (Pa. 1979).

In general, "where an easement is used and enjoyed for the benefit of a dominant estate, it is the owner of the dominant estate who is under obligation to keep the easement in good repair; and he may be liable to third persons if he fails to keep the right of way in a proper state of repair." Mscisz v. Russel, 487 A.2d 839, 840 (Pa. Super. 1984). "The owner of a dominant estate may not exercise the rights granted to him or her without regard to the rights of the servient owner." Purdy v. Zaver, 580 A.2d 1127, 1131 (Pa. Super. 1990).

**Property Owners Association**

There is relatively little case law describing the common law creation of property owners associations. In 1996, Pennsylvania enacted the Uniform Planned Community Act (the "UPCA", 68 Pa. C.S.A. § 5101 et seq.), which codified the creation and maintenance of planned communities; only some of the UPCA's provisions apply

11

retroactively. 68 Pa. C.S.A. § 5102. In particular, Section 5301 of the UPCA, regarding the organization of unit owners' associations, only applies to communities created after the enactment of the UPCA.[7]

Property owners associations generally have the authority to collect fees for the maintenance of roads and common areas, regardless of the existence of a written agreement with individual property owners. See Meadow Run and Mountain Lake Park Ass'n v. Berkel, 598 A.2d 1024, 1026 (Pa. Super. 1991). The UPCA's provisions regarding assessments for common expenses do apply to planned communities created before 1996, though "only with respect to events and circumstances occurring after [2004] and [as long as they] do not invalidate specific provisions contained in existing provisions of the declaration, bylaws or plats and plans" of such communities. 68 Pa. C.S.A. § 5102(b.1)(1). Under the UPCA, "Except as provided by the declaration [that created the planned community]... If a common expense is caused by the negligence or misconduct of any unit owner, the association may assess that expense exclusively against his unit." 68 Pa. C.S.A. § 5314(c)(4).

---

[7] Although not binding, it is worth noting that Section 5301 of the UPCA, regarding the organization of unit onwers' associations, states that "[a] unit owners' association shall be organized no later than the date the first unit in the planned community is conveyed to a person other than a successor declarant... The association shall be organized as a profit or nonprofit corporation or as an unincorporated association." In the present case, the first effort made by any party to organize a Lehigh Pointe Property Owners Association took place more than twenty years after the first conveyance of lots.

12

## FINDINGS OF FACT/DISCUSSION

1. Lehigh Pointe was originally intended to be a residential community, the development of which was to take place in phases.

2. Development stalled before the first phase was complete.

3. No Lehigh Pointe Property Owners Association was ever formed.

4. Pointe Drive was intended for residential traffic.

5. The Lehigh Pointe property owners' deeds created a reciprocal scheme of easements granting each property owner the rights of ingress and egress over Pointe Drive.

6. Plaintiff's property was a dominant estate with regard to the easement over the Pointe Drive culvert.

7. A significant portion of the damage to the Pointe Drive culvert was caused by the introduction and continuation of significant truck traffic to and from the commercial spring.

13

The primary issue in this case comes down to the scope of Plaintiff's right-of-way over Pointe Drive. In looking both at the easement granting the right-of-way -- and the associated Covenant 6 -- general principles of contract construction must apply.

Plaintiff has argued that it in fact holds a servient estate over Pointe Drive, as evidenced by the language in Plaintiff's deed reserving a right of way for Boulder Run Corporation and its successors and assigns. This language, though, doesn't grant Plaintiff a property interest; what this language, which is present in each property owner's deed, appears to accomplish is to guarantee that each property owner will have the right to use all portions of the roads, regardless of which parcel the road passes through.

We note that the right-of-way language in the Lehigh Pointe property owners' deeds does not specify the scope of the right of way. Thus, under Zettlemoyer and Lease, the intention of the parties that created the easement -- as informed by a reading of the whole document, which in this case consists of not only the deeds but the Plan -- must be ascertained. Zettlemoyer, 657 A.2d at 924; Lease, 403 A.2d at 562-63. As there are no explicit restrictions in Plaintiff's easement over Pointe Drive, the Plaintiff may use the easement in a reasonable manner.

An inspection of the Plan, along with the testimony elicited at trial, suggests that Lehigh Pointe was originally intended to be a large residential community. The Plan splits one area of the lot into 10 numbered lots, and notes that "future development" will occur. There were plans for a "pedestrian nature walk." The restrictive covenants and general notes address issues that would be common in residential communities.[8] However, not even the first phase of residential development was completed as planned,

---

[8] General Notes 5, 6, 8, 9 and 10 suggest a residential character, as do each of the Restrictive Covenants.

14

and Lehigh Pointe remained a large, wooded tract with a scattering of houses until 1999, when the commercial spring began.

When Plaintiff's predecessors in interest began introducing truck traffic to Pointe Drive, the residential character of Lehigh Pointe was changed, and Pointe Drive – a relatively small dirt road – was subjected to new stresses. After careful consideration of the evidence presented, including each Party's expert testimony and a judicial viewing of Lehigh Pointe, this Court finds that a significant portion of the damage to the culvert was caused by the increased weight and frequency of traffic on Pointe Drive and is therefore directly attributable to Plaintiff and its predecessors in interest. Although it is clear that some natural deterioration of the culvert had occurred, the damage to the culvert would not have been nearly as significant had there only been residential traffic, and the culvert would not have failed when it did but for the trucks frequently passing over it. Ultimately, the need for significant repairs was caused by Plaintiff and its predecessors in interest exceeding the reasonable scope of the easement they possessed over Pointe Drive, and thus, as the dominant estate, it is the responsibility of Plaintiff to repair the damage caused.

It is worth noting further that the Court finds that no Lehigh Pointe Property Owners Association was ever formed. This Court can find no case law directly stating that such an association can be created simply by a covenant in a subdivision plan without any further action from any party. Although Plaintiff claims that the Property Owners Association was simply not to be organized until it was needed, this Court can find no reason to allow the intended association to be created after 24 years of not only inactivity but literal nonexistence. The Lehigh Pointe Property Owners Association was

15

simply another piece of the Plan that was not developed as intended, and thus the property owners of Lehigh Pointe cannot be reasonably expected to have acted as though the association exists.

Regardless of the existence of the Property Owners Association, however, the matter is decided by the evidence which showed that Plaintiff and its predecessors in interest exceeded the scope of the easement, thereby causing deterioration, and are therefore obligated, as the dominant estate, to remedy the damage themselves.


## CONCLUSION

For the reasons stated above, this court finds in favor of the Defendants, and holds that the Defendants are not obligated to contribute to the construction done on the culvert at issue in this matter. An Order to this effect is attached as page 17.


The Prothonotary is directed to enter this Opinion and the attached Order of record, and mail a copy to all counsel of record, pursuant to Pa. R.C.P 236.

16